In re SPAGNOL ENTERPRISES, INC., a Pennsylvania corporation and its wholly owned subsidiaries, Debtors.

SPAGNOL ENTERPRISES, INC., a Pennsylvania corporation and its wholly owned subsidiaries, Plaintiffs,

v.

PENN LEAR DEVELOPMENT CORPORATION, and Westinghouse Electric Corporation, Defendants.

Bankruptcy No. 82–1739.

Adv. No. 84–117.

United States District Court, W.D. Pennsylvania.

Dec. 29, 1987.

Christopher A. Beck, Ravick, Beck & Henny, P.C., Pittsburgh, Pa., for Spagnol Enterprises, Inc.

Robert O. Lampl, Pittsburgh, Pa., for Penn Lear Development Corp.

David Posey, Sr. Counsel, Westinghouse Elec. Corp., Pittsburgh, Pa.

Bernhard Schaffler, Schaffler & Böhm, Pittsburgh, Pa., trustee.

## ORDER OF COURT

SIMMONS, District Judge.

AND NOW, this 23rd day of December, 1987, it is hereby ORDERED, ADJUDGED and DECREED that:

Judgment is awarded for Spagnol Enterprises, Inc. in the amount of $227,023.69;

Judgment is awarded for Penn Lear Development Corporation in the amount of $47,653.33;

The parties are to share proportionately in the escrow fund.

## MEMORANDUM OPINION
## PROPOSED FINDINGS OF FACT

### and
### CONCLUSIONS OF LAW

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court is a contract action brought by Spagnol Enterprises, Inc. (hereinafter "SEI") the Debtor, against Penn Lear Development Corporation (hereinafter "Penn Lear"), asserting breach of a Lease Agreement causing the following damages:

| | | |
|---|---|---|
| 1) | Prior rental due and owing: | $222,149.68 |
| 2) | Overruns on agreed-to items: | 2,206.78 |
| 3) | Reimbursement for sprinkler system: | 63,004.84 |
| 4) | Reimbursement for services performed which allegedly were Penn Lear's responsibility: | 99,192.34 |
| | Total Damages Sought | $386,553.64 |

Penn Lear has stipulated to the rental figure as stated, but has challenged the validity of the remaining charges. Penn Lear has further raised counterclaims against SEI, also asserting breach of the Lease Agreement, and contends that it has sustained the following damages:

| | | |
|---|---|---|
| 1) | Reimbursement for buyout of prior tenant's lease: | $ 13,000.00 |

| | | |
|---|---|---|
| 2) | Reimbursement for work done by Penn Lear which allegedly was Spagnol's responsibility: | $96,866.63 |
| 3) | Reimbursement for additional costs associated with roof repairs: | 7,934.50 |
| 4) | Lost revenues resulting from Westinghouse's decision not to exercise its renewal options: | 226,378.80 |
| | Total Damages Claimed | $344,179.93 |

SEI acknowledges responsibility for the debt incurred in buying out the previous tenant, but challenges the remaining assertions.

Having taken three and one-half (3½) days of testimony relating to these claims, we have determined that SEI has proved damages totaling $227,023.69 and Penn Lear has proved damages of $47,653.33. Counsel to both parties are the Trustees of an escrow account upon which this litigation is based. We are led to believe that said account contains a sum less than $274,677.02. Therefore, the parties shall divide said escrowed account based upon their percentages of the total award.

This action constitutes a related proceeding; therefore we will submit Findings of Facts and Conclusions of Law to the District Court.

## BACKGROUND

On May 17, 1982, three Chapter 11 bankruptcy petitions were filed on behalf of Arthur J. Spagnol (hereinafter "Spagnol"):

1) Spagnol Enterprises, Inc. (hereinafter "SEI")

2) Delmar Leasing Corporation (hereinafter "Delmar")

3) A.J. Spagnol

Spagnol is the president and majority shareholder of SEI, a Pennsylvania corporation which acts as a holding company for various other properties, including a thirty thousand (30,000) square foot shopping center building in Murrysville, Pennsylvania known as Three Murry Center, Inc. (hereinafter "3MC"). Spagnol is also president and twenty percent (20%) owner of Delmar, which owns a thirty thousand (30,000) square foot warehouse building in Monroeville, Pennsylvania. As part of the Chapter 11 proceedings, Spagnol sought and procured buyers and/or tenants for the various properties owned by the debtors-in-possession.

Penn Lear Development Corporation (hereinafter "Penn Lear") is a Pennsylvania corporation owned and operated by Bernard Dickun (hereinafter "Dickun") and Russell Miller (hereinafter "Miller"), and is in the business of real estate development.

Penn Lear represented Westinghouse Electric Corporation (hereinafter "Westinghouse") in its attempt to locate suitable office space for a particular division. Dickun and Miller originally approached Spagnol, regarding the leasing of the Monroeville property and subleasing to Westinghouse. On March 8, 1983, the Bankruptcy Court entered an Order authorizing Delmar to execute such an agreement for its Monroeville property. Said agreement was not finalized because Westinghouse was dissatisfied with the building and the location.

Within a month, Spagnol and Penn Lear had agreed to offer Westinghouse a sublease on the 3MC facility. On April 12, 1983 Westinghouse indicated that the facility would be acceptable, provided certain "building standard" specifications were met. A lease was prepared and executed by Penn Lear, as Lessor, and Westinghouse, as Lessee, on April 29, 1983. Simultaneously, an identical lease, save the name, address and signature pages, was executed by 3MC, as Lessor, and Penn Lear, as Lessee. The altered pages were prepared by Mrs. Spagnol at Spagnol's office upon Dickun's request. Spagnol and Dickun both acknowledge reading and signing same.

Each lease included, as an Exhibit (hereinafter "Exhibit 61"), the Westinghouse list of specifications, which had to be completed prior to its July occupancy. SEI and Penn Lear agreed to share the responsibility for providing these specific services. The delineation of same is indicated on the Exhibit by the initialing of said items with "Spag" or "PL". These markings were handwritten by Dickun.

Once the work was apportioned, construction began. Because of its bankruptcy status, SEI chose to perform those items which appeared to be more labor intensive,

while trying to avoid incursion of material costs. SEI performed the work it agreed to do and "extras" outside the Agreement, utilizing the services of its own employees. Penn Lear employed a company called Facility Service, Inc. to provide essentially all of the labor on the items for which it was responsible, and agreed to do more of the work requiring utilization of materials as well as labor.

From the outset, construction ran behind schedule, causing consistent and recurring prompting by Westinghouse. Penn Lear became frustrated by what it perceived to be procrastination by SEI in performing its responsibilities.

It appears that after the Lease began, major problems began to occur. Westinghouse suffered with plumbing and sewage difficulties; when SEI did not rectify the problem, Penn Lear took over. Similarly, during the first winter of its occupancy, Westinghouse sustained damages as a result of a faulty roof. Penn Lear arranged for continuous repairs, apparently because SEI failed to do so. At approximately the same time, Penn Lear began withholding rental payments, claiming a need to apply said money to the repairs performed on SEI's behalf. This lawsuit resulted therefrom.

Having taken substantial testimony, and having had significant opportunity to observe the witnesses' demeanor, the Court finds the testimony of both Spagnol and Dickun to be more incredible than credible. In preparing the following factual findings and legal conclusions, we rely almost entirely on the various writings presented at the evidentiary hearings, giving very little weight to the oral testimony offered.

## FINDINGS OF FACT

### A. Lease Responsibilities

1) SEI, as Lessor, was responsible for any construction and/or improvement to the property as outlined in Exhibit 61.

2) Penn Lear, as Lessee, was required to reimburse SEI for expenses incurred in excess of those associated with Exhibit 61.

3) SEI was responsible for obtaining all permits for occupancy of the building as an office facility.

4) Penn Lear was responsible for repairing and maintaining the interior of the premises; however, Penn Lear was not responsible for the electrical, heating, air conditioning and plumbing systems.

5) SEI had a duty to maintain and repair the exterior of the premises, including walls, roof, paving and fencing; and, those interior items for which Penn Lear was not responsible.

6) Penn Lear had the right to make any necessary or desirable alterations to the property, as long as they were properly constructed. Upon Lease termination, Penn Lear had the option to either allow same to become SEI's property or to remove the alterations and return the property to its original state, wear and tear excepted.

7) Penn Lear had the right to install lighting and air conditioning equipment; such items were to remain its personal property and were subject to removal by Penn Lear, provided it reasonably restored SEI's property if removal caused any substantial damage.

8) If Penn Lear breached the Lease Agreement, SEI had the right to terminate the Lease and repossess the property, without relinquishing any right to full rental payments, subject to mitigation of expenses.

9) If SEI breached the Lease Agreement, Penn Lear had the right to terminate the Lease, without being required to continue rental payments.

10) Penn Lear had the option to exercise three 1–year renewals, each with 90 days' notice prior to the renewal term.

11) The Lease was not to be changed or modified without the signatures of both parties thereto.

### B. Lease Payments From Penn Lear To SEI ($222,149.68)

1) SEI and Penn Lear have stipulated that the rental payment presently due and owing, exclusive of any additions or offsets, is $222,149.68.

## C. Items Spagnol Agreed To Perform Pursuant To Exhibit 61 ($2,206.78)

1) Spagnol agreed to perform certain of the Westinghouse specifications, as described on Exhibit 61.

2) The actual cost of performing these services was $2,206.78, or approximately five percent (5%), over the written cost estimates.

3) The decision to perform these services was based in large part on their labor intensive quality, rather than upon the cost estimates prepared by Dickun.

4) Spagnol did not justifiably rely upon the estimate figures, and SEI is not entitled to reimbursement for said over-run.

## D. SEI's Claim Against Penn Lear For The Cost Of The Sprinkler System ($63,004.84)

1) As part of its specifications, Westinghouse required the installation of a fiberglass ceiling in the 3MC building.

2) The Murrysville Building Code required that any building using said ceiling must have installed a sprinkler system as a condition to receipt of an occupancy permit.

3) Mrs. Spagnol borrowed $30,000.00 in order to purchase the sprinkler system. Her total cost, including interest, was $63,004.84.

4) Neither SEI nor Penn Lear originally anticipated the need for a sprinkler system.

5) The parties disagree as to their expectations regarding repayment of said cost by Penn Lear. Spagnol claims Penn Lear was to repay the full amount, including interest, in monthly payments over the life of the first 3–year contract. Dickun claims that Penn Lear agreed to pay the $30,000.00 cost of the sprinkler system, but only if it exercised the three 1–year options, and that payments would be made on a monthly basis during years 4, 5 and 6 of the Lease. Dickun further stated that Penn Lear did not agree to reimburse SEI for the interest costs incurred in borrowing the funds to purchase the sprinkler system.

6) The Court finds Dickun's testimony to be more credible than Spagnol's testimony.

7) Penn Lear did not exercise the extended Lease options.

8) It is clear from the testimony that there was no meeting of the minds between these parties.

9) The sprinkler system became a permanent fixture to the building and resulted in a capital improvement inurring to SEI's benefit.

10) SEI has not met its burden of proof as to this damage claim; said claim is disallowed.

## E. "Extras" Performed By SEI On Behalf Of Penn Lear ($99,192.34)

1) *Clean–Up Of The Monroeville Property* ($18,000.00):

a. This claim is a result of the authorized, but unexecuted, lease arrangement with Delmar for the Monroeville property. Spagnol asserts that in preparation therefore, SEI expended $18,000.00 in clean-up costs. Spagnol claims that SEI was to be reimbursed by Penn Lear as part of the Lease Agreement for the 3MC building.

b. Dickun claims that Spagnol misinterpreted his statement regarding recovery of this money. Mr. Dickun testified that no figure of $18,000.00 was to be transferred; rather, that SEI would generally recover any out-of-pocket costs it had made on the Monroeville property because the deal at 3MC was a much better one.

c. There is no writing evidencing this particular damage claim. We have only the testimony of the two parties, which shows a polarity in interpretation.

d. SEI has not met its burden of proof on this damage claim; therefore, said claim is disallowed.

2) *Grading And Clean–Up* ($1,427.20):

a. Spagnol testified that the grading and clean-up of the 3MC property involved exterior work; specifically the leveling of a space to create an outdoor rest area for Westinghouse employees, the patching of a ditch, and the removal of debris from the lot.

b. Grading of the land in the exterior portion of the property does not constitute landscaping.

c. The executed Lease requires SEI to perform all exterior work.

d. Exhibit 61 requires SEI to remove debris from the side lot.

e. SEI has not met its burden of proof as to this damage claim.

3) *Roof Panel Repair/Ceiling Perlins & Truss Spreaders* ($20,616.00):

a. Spagnol testified that the roof panels were part of the roof system and needed to be secured prior to putting up a ceiling. He further testified that these items were adjacent to the inside of the roof and held insulation in place.

b. The ceiling perlins and truss spreaders were necessary in order to suspend the ceiling tile in the appropriate manner.

c. The roof panel, ceiling perlins and truss spreaders are all located above the ceiling.

d. According to the Lease executed by the parties, SEI was required to perform all repairs of the roof.

e. According to Exhibit 61, SEI was responsible for installation of the suspended ceiling system.

f. SEI was responsible for those items above the roof panels, ceiling perlins and joint spreaders and was also responsible for that item below same.

g. SEI has failed to meet its burden of proof in order to recover on this claim.

4) *Extras* ($3,456.60):

a. Spagnol testified that extras constituted various miscellaneous items performed by SEI and/or its employees for Penn Lear's benefit.

b. Spagnol asserted the existence of a list itemizing these miscellaneous charges but did not offer same as evidence.

c. SEI has provided no substantiation whatsoever for this claim and therefore has not met its burden of proof thereon.

5) *Generator Room* ($836.00):

a. Spagnol testified that during the conversion and construction of the generator room, a fire occurred on the roof over said room, requiring replacement of same, along with some doors and other miscellaneous items not further identified.

b. According to the originally executed Lease Agreement between the parties, SEI is responsible for all maintenance and repairs to the roof.

c. The repairs to the generator room were not part of a separate written agreement.

d. SEI has failed to provide the necessary substantiation to prove its claim and therefore is unable to secure damages for this item.

6) *Air Conditioning Unit* ($3,710.00):

a. Spagnol testified that in order to bring the heating and air conditioning system up to Westinghouse's standards, he sold a new 5-ton air conditioner to Dickun, at his cost. Spagnol is presently unaware of the air conditioner's whereabouts.

b. Dickun testified that it was never discussed, nor did he understand that he was to pay for the air conditioning unit. He never received a bill, nor has any claim been made for the amount requested prior to this litigation.

c. The Lease executed by and between the parties clearly states that Penn Lear is entitled to install any air conditioning units it sees fit, and that said air conditioning units will remain Penn Lear's property regardless of how affixed to the permanent structure. Penn Lear has the option to either leave the air conditioner on the property or to take said air conditioner with it, provided it restores the property to a condition similar to that which existed when the Lease began.

d. Spagnol claims that the air conditioner was a new 5-ton unit, and that his cost was $3,710.00. Dickun has offered no testimony to dispute that.

e. SEI has met its burden of proof on this claim and is therefore awarded damages in the amount of $3,710.00.

7) *Security Service* ($2,754.00):

a. Spagnol testified that a security guard was hired as a result of theft of property at the 3MC site, claiming originally that property stolen belonged to Penn

Lear. Spagnol testified that the security guard's wages were $7.00 per hour, and that the guard was on the premises for 3–4 weeks. Spagnol further testified that the guard was hired for the mutual benefit of SEI and Penn Lear.

b. Dickun testified that he never requested, nor forced Spagnol to hire said security guard, that it was done on Spagnol's request, and that Dickun has never been billed nor had a claim made against him for this expenditure until this lawsuit.

c. Spagnol has offered no substantiating evidence as to the amount in question, nor has he proved that the security guard was hired for the mutual benefit of the parties.

d. SEI has not met its burden of proof on this issue.

8) *Entrance Door* ($5,047.52):

a. On direct examination Spagnol testified that the entrance door was not an item that was *originally contemplated* and that a double entry was required to provide an air pocket for energy control. On cross-examination, he testified that the entrance door constituted a vestibule about 10 by 14 feet, with double aluminum doors, and was necessary for comfort rather than energy control.

b. Spagnol was not aware and/or could not recall whether this door was part of Westinghouse's specifications.

c. Dickun testified that the entrance doors were part of the rebuilding of a completely new entrance, including brick work, and that said entrance is a permanent fixture on the building. Exhibit 61 states that the repair and restoration of the front facade of the building would be Penn Lear's responsibility. Similarly, Penn Lear was responsible for removing the existing front entrance door and replacing it with glass or solid paneling, and replacement of all damaged exterior doors and frames, as required.

d. SEI has listed a charge of $5,047.52 for the installation and/or supply of the entrance door. However, SEI has presented absolutely no supporting documentation for that figure. It offers no invoices for the amount paid or for the purchase of said doors; there is no explanation as to whether the amount stated includes the purchase of the doors at cost or with profit, or whether the amount included represents labor. We have been provided none of the relevant supporting data in order to verify this claim. Therefore, SEI has not met its burden of proof as to this amount.

9) *Side Yard Clean–Up* ($806.28):

a. The original Lease executed by the parties requires SEI, as Lessor, to maintain and repair all exterior areas.

b. Exhibit 61 identifies SEI as the party responsible for removing debris from the side lot. This item was SEI's responsibility and no charge should be approved therefor.

10) *Repair End Wall* ($1,336.00):

a. On direct examination, Spagnol testified that the end wall is involved with the structure of the roof and needed to be repaired because it was loosened. On cross-examination, Spagnol contradicted himself, stating that repairing the end wall involved the end wall of the building, and as it was part of the exterior of building, did not involve the roof.

b. Dickun was completely unable to identify what this item was, because of the ambiguity in the verbiage.

c. The Lease required that SEI be responsible for all roof and exterior maintenance and repair; regardless whether Spagnol was correct on direct or on cross, it was SEI's responsibility.

d. The claim for this item must be disallowed.

11) *Emergency Lights* ($6,077.36):

a. Spagnol states that the item titled "emergency lights" refers to the installation of the generator and the creation of the generator room, which were necessary to obtain building approval by the State Department of Labor and Industry.

b. The original Lease executed by and between the parties specifically states that SEI would be responsible for all maintenance and improvements necessary to bring the building "up to Code".

c. This item is also included on Exhibit 61; however, on Exhibit 61, neither party's initials appear, indicating that neither party specifically chose to do said work.

d. The original Lease specifically states that all work required to be performed on Exhibit 61 would be SEI's responsibility.

e. The generator and generator room are now, and continue to be, permanent fixtures and capital improvements to the property.

f. SEI has not met its burden of proof as to this claim.

12) *Roof Drains* ($901.35):

a. Spagnol testified that replacement of the roof drains was required when the building was altered to provide for a single center entrance to the entire building. Spagnol further testified that these drains were located approximately 6 inches above the ceiling under the roof.

b. Dickun countered by stating that the repair and replacement of these roof drains was required as a result of damage sustained during a major rain storm, and that these drains were in fact part of the roof.

c. The Lease executed by the parties makes the roof SEI's responsibility, and the ceiling Penn Lear's responsibility. However, the notations on Exhibit 61 indicate that SEI assumed responsibility for the installation of the ceiling. It also shows that neither party accepted specific responsibility on Exhibit 61 for provision of the insulation above the suspended ceiling and under the roof. As SEI is responsible for the roof and is also responsible for the ceiling, it cannot be assumed that Penn Lear would necessarily be responsible for those items sandwiched between, unless Penn Lear personally accepted responsibility therefore.

d. SEI has not met its burden of proof on this claim and therefore, damages cannot be awarded.

13) *Thermopanes* ($570.41):

a. Penn Lear concedes that the installation of the thermopane windows in the computer room was, and is, an appropriate charge; and, further accepts the claim of $570.41 as stated.

b. Therefore, this charge will be allowed.

14) *Concrete Block* ($848.00):

a. During the construction of the property, Spagnol testified that he cleaned some concrete block so that Penn Lear might use it to rebuild the restrooms.

b. Spagnol testified that the block in question was used block, and that the value he assigned to these blocks, $1.00 each, was reached arbitrarily. He further advised that he is not in the business of selling said blocks, nor does he purchase them on a regular basis, and has no independent knowledge of the pricing for concrete blocks. The additional $48.00 charge represents the sales tax which Spagnol claims he paid on the 800 $1.00 blocks.

c. Dickun challenged the amount rather than the concept, admitting that payment for the concrete block was Penn Lear's responsibility.

d. Dickun indicated that the price of new block would be approximately $.68–.70 per piece.

e. Penn Lear concedes the cost of the concrete blocks to the extent of $.70 per block, plus tax.

f. Therefore, SEI is entitled to damages totaling $593.60 including tax.

15) *Entrance Tile* ($800.00):

a. Spagnol claims that Dickun hired a contractor to perform the work on the entrance tile. Spagnol further claims that Dickun would not pay said contractor, who sought payment from Spagnol, and was so paid.

b. Spagnol stated that the amount was exactly $800.00, as per the contractor's invoice, which Spagnol claimed to have but which was not presented as evidence.

c. Dickun asserted that this item was offset in a barter deal, wherein SEI's people installed the tile, which was Penn Lear's responsibility, and Penn Lear provided the use of a laser light, needed in another part of the construction.

d. Exhibit 61 states that restoration of the front facade and replacement of the

front entrance door, as well as provision of a windbreak enclosure at the front entrance door, were Penn Lear's responsibility.

e. Spagnol claims that the money he paid was pursuant to an invoice and that the payment was made by check; however, he has provided the Court with neither a copy of the invoice, nor a copy of the cancelled check evidencing said payment.

f. The lack of documentary evidence, coupled with the contradictory testimony of Dickun, indicating an oral agreement to offset certain costs and expenses, is sufficiently persuasive to place the burden of further proving this item on SEI. As it has not done so, SEI has not met its burden of proof and will not be able to claim damages for this item.

16) *Rentals, Equipment* ($7,550.00):

a. Spagnol testified that this item represents equipment which SEI put on the construction job, and was used jointly by SEI and Penn Lear. He admits that Penn Lear used SEI's truck to pick up bricks and that SEI used Penn Lear's equipment to assist with the clean-up of the property, and that this was a joint effort.

b. Under cross-examination, Spagnol admitted that all but $1,500.00 of this claim would represent equipment used to perform those items which SEI agreed to perform pursuant to the Lease Agreement, i.e. those items to which Spagnol affixed his initials.

c. Dickun testified that during the construction phase of this project, all parties were acting very amicably and parties were using each other's equipment on a regular basis.

d. Dickun further testified that Penn Lear had made no claim in its counterclaim for the equipment used on the site by SEI's employees.

e. Because SEI has not met its burden of proof as to this item, no damages will be allowed.

17) *Ceiling Tile Extras* ($1,500.00):

a. Spagnol again asserts that the contractor charged SEI $1,500.00 for realign-

ment of the ceiling, claiming same was originally installed off-center.

b. Dickun testified that these ceiling tile extras were the result of a problem with the installation and positioning of the sprinkler system. Because the sprinkler system was installed after the ceiling tile was placed, certain portions of the ceiling tile did not sit properly after the installation of the sprinkler, and had to be redone.

c. The original Lease executed by and between the parties indicates that all interior work is the responsibility of Penn Lear. However, according to Exhibit 61, the installation of the ceiling system was SEI's responsibility. That the amount of materials and labor required for said installation was increased does not shift the burden of responsibility for the performance of that item.

d. SEI has not met its burden of proof as to this item and damages will be denied.

18) *Supervision* ($4,000.00):

a. SEI asserts a $4,000.00 charge for supervision by its foreman, Mr. Nick Marchesak.

b. On cross-examination, Spagnol admitted that Marchesak was on-site only periodically during the construction period.

c. Dickun testified that he knew Marchesak was on the property and that he was supervising, but had no idea that it was being charged against Penn Lear, as Penn Lear had a supervisor of its own for its own employees.

d. SEI has provided no documentation indicating the hourly rate paid to Marchesak, nor does it provide any indication that said amount was in fact paid to Marchasek.

e. SEI has not met its burden of proof and therefore damages will not be awarded in this amount.

19) *Rent Equipment* ($734.00):

a. Spagnol testified that this is a representation for the rental of miscellaneous equipment, and was not able to identify exactly what equipment was involved.

b. On cross-examination, Spagnol claimed that this amount included a $400.00

rental payment for a laser machine which was rented by Penn Lear.

c. Thereafter, Spagnol stated that Penn Lear charged the contractor $400.00 for the laser machine, and that said contractor had SEI pay him for it.

d. Spagnol further testified that SEI paid the $400.00 to Penn Lear by check. SEI has not produced said check as evidence.

e. Dickun testified that the $734.00 claim does in fact involve the rental of the laser. However, Dickun testified that Facility Service paid for the rental of the laser, not SEI, and that SEI was charging Penn Lear for something that Penn Lear had supplied.

f. SEI has not met its burden of proof as to this item; therefore, no damages will be allowed.

20) *Gasoline, Propane & Miscellaneous Expenses* ($1,006.92):

a. Spagnol testified that these fuel items are those associated with running the compressors, backhoes, trucks and other equipment used on the site.

b. Spagnol testified that the total figure for this was derived from the addition of the various invoices for the fuel and expenses involved.

c. As in No. 16 above, these expenses were involved with the use of the equipment which, it is clear to the Court, was a shared effort and will not be compensable as damages herein.

21) *General and Administrative Cost/Profit* ($17,215.20):

a. SEI included the costs of profit and administration in order to pay for the various payroll items to cover the men who worked on the job.

b. Spagnol testified on cross-examination that addition of ten percent (10%) for administrative costs and ten percent (10%) for profit as standard procedure in the construction industry; he further testified that he is not a contractor, nor is he in the business of hiring himself out as same.

c. Spagnol included these charges on the equipment rental and the materials pur-

chased, as well as on the labor-related items.

d. Dickun testified that there was never any discussion by and between the parties as to additional costs for administration and profit, nor did Penn Lear charge that same type of item to SEI.

e. SEI has not met its burden of proof; the claim is denied.

**F. Charley Brothers Lease ($13,000.00)**

1) Charley Brothers, t/d/b/a Shop & Save Supermarket, had leased one-half (½) of the Murrysville property from Spagnol since 1969.

2) During the course of their relationship, communications between Charley Brothers and Spagnol had become strained.

3) In order to prepare the full building for use by Westinghouse, the Charley Brothers lease needed to be terminated.

4) Due to the aforementioned strain between SEI and Charley Brothers, it was agreed that Dickun, representing Penn Lear, would negotiate and settle the lease on behalf of Spagnol.

5) Penn Lear paid Charley Brothers $15,000.00 as a full settlement of its lease agreement.

6) SEI agreed to reimburse Penn Lear for the $15,000.00 expenditure.

7) To date, SEI has paid Penn Lear $2,000.00 on the $15,000.00 debt.

8) SEI acknowledges and stipulates that the remaining debt is $13,000.00.

**G. Items Penn Lear Performed Which Were SEI's Responsibility ($96,866.63)**

1) *Sprinkler Pit and Support Work/Water line Extension* ($8,122.00):

a. Dickun testified that the above-named items were required as support for the sprinkler system installed by SEI.

b. The sprinkler system was required to meet standards under the Murrysville Building Code, arising as a result of the installation of the fiberglass ceiling.

c. The Lease executed by and between the parties requires SEI to obtain all permits and to make any alterations or

changes necessary to bring the leased premises under Code standards.

d. Exhibit 61 does not provide for the installation of the sprinkler system; therefore, the original Lease has not been modified thereby.

e. Penn Lear has met its burden of proof on this issue and damages will be allowed.

2) *Parking Lot Repairs* ($7,337.75):

a. Westinghouse was dissatisfied with the conditions of the parking lot in that many potholes, cracks and soft spots existed.

b. The largest cost in this item resulted from a need to hire union people on a weekend to meet Westinghouse's occupancy date requirements.

c. The executed Lease indicates that SEI would be responsible for maintaining and repairing the leased premises, including any required paving.

d. Penn Lear has met its burden of proof as to this issue and the damages will be allowed.

3) *Site Grading* ($800.00):

a. Dickun testified that after completing the sprinkler pit and water line extensions, many excavated areas needed to be filled.

b. Exhibit 61 states that all landscaping is Penn Lear's responsibility.

c. SEI was unable to sufficiently explain why site grading is part and parcel of landscaping, as opposed to outside maintenance, which is SEI's responsibility under the executed Lease Agreement.

d. Penn Lear has met its burden of proof; damages will be allowed on this issue.

4) *Seeding and Bumper Blocks* ($3,503.00):

a. Dickun testified that the seeding involved "beautification" of an area wherein the employees of Westinghouse would be able to eat meals and relax. He claims this is above and beyond the landscaping anticipated in Exhibit 61.

b. Dickun further testified that the bumper blocks are those barriers which were set up in the parking lot to allow for spacing of individual car parking.

c. Dickun stated that the majority of the cost involved in this item was for the bumper blocks in the parking lot.

d. On cross-examination, Dickun admitted that the seeding portion of this bill was probably landscaping and would be his responsibility pursuant to Exhibit 61.

e. Dickun further testified that he was, at the time of trial, unable to separate the seeding charges from those for the bumper blocks.

f. The testimony offered is insufficient for Penn Lear's burden of proof on this particular item; therefore, this claim must be disallowed.

5) *Work On Front Bank* ($594.00):

a. Dickun testified that the work on the front bank was a result of the installation of the sprinkler pit and water line extensions.

b. On cross-examination, Dickun admitted that some of the monies charged for this claim involve cutting of grass, and landscaping of the front corner.

c. The documentary evidence to support this claim does not separate each of the individual work items according to labor and materials.

d. As it is impossible to determine from this documentary evidence the amount of the allowed claim, Penn Lear has not met its burden of proof and no damages will be allowed on this item.

6) *Gas Line Installation And Welding* ($1,736.29):

a. Dickun testified that upon inspection, the interior gas lines proved to be unsafe, requiring rewelding of same in order to obtain gas company hook-ups.

b. A certified welder was required to do the work.

c. The original bill was paid by Facility Service, Inc., and Facility Service thereafter billed Penn Lear.

d. The original Lease executed by and between the parties states that the SEI will

be responsible for all maintenance and repair to electrical, heating, air conditioning and plumbing systems.

e. Exhibit 61 does not delineate responsibility for this plumbing work; therefore, the original Lease is binding.

f. Penn Lear has sufficiently met its burden of proof as to this item and the damages, as requested, will be allowed.

7) *Repairs To The Roof And Ceiling Caused By Water Damage* ($2,322.29):

a. Dickun testified that during the course of the work on the building, a severe rain storm caused water damage to occur to the roof and ceiling on the property, which Penn Lear repaired by and through Facility Service, and for which Penn Lear is now claiming reimbursement.

b. On cross-examination, Dickun testified that while the Exhibits included items such as exterior painting and work on the generator room which were not billable to SEI, the amount of this claim does not include work performed on those items.

c. Penn Lear has met its burden of proof on this issue and the above claim will be allowed.

8) *HVAC—Heating, Ventilation and Air Conditioning* ($38,075.00):

a. Based on representations made by SEI, Penn Lear assumed that the heating and air conditioning facilities were sufficient for Westinghouse.

b. Dickun testified that monies were expected to be expended for heating and air conditioning, in that when a building has been unused for a period of time, there will be a need to replace filters and seals and perform other general maintenance and repair.

c. After conducting additional inspections, it appeared that several of the heating and air conditioning units on the building were not rehabilitatable, requiring the installation of new equipment.

d. The original Lease states that SEI would be responsible for maintenance and repair to all electrical, heating, air conditioning and plumbing systems.

e. Based on Exhibit 61, Penn Lear assumed all responsibility for maintaining and operating the heating and air conditioning systems at the appropriate levels of heat and humidity.

f. Penn Lear's acceptance of said responsibility pursuant to Exhibit 61 modifies SEI's responsibility therein.

g. The fact that Penn Lear's estimate for heating and ventilating work was grossly inadequate due to its lack of awareness as to the quality of the air conditioning in place, does not change the fact that Penn Lear assumed responsibility for this item on Exhibit 61.

h. Therefore, Penn Lear is not entitled to any damages for this particular claim.

9) *Drawings and Labor & Industry* ($1,525.00):

a. Dickun testified that this claim represents funds expended for drawings and exhibits necessary to receive an occupancy permit from the Department of Labor & Industry in Harrisburg, Pennsylvania.

b. On cross-examination Dickun admitted that one of the items listed on the invoices related to a project other than that involving SEI, and that the amount in question should be removed from the damage claim.

c. Therefore, damages will be allowed in the amount of $1,477.20.

10) *Municipal Authority—Westmoreland County* ($1,500.00):

a. Dickun testified that this fee was required by the Water Authority to service the sprinkler system. Said service was necessary in order to meet building Code requirements.

b. The charge indicated is determined by the Authority itself.

c. According to the Lease executed by and between the parties, all items necessary to bring the building within Code specifications are SEI's responsibility.

d. Penn Lear has met its burden of proof as to this claimed amount.

11) *Kap Electric* ($2,177.00):

a. Dickun testified that Spagnol advised that the emergency lighting on the building was sufficient.

b. It later appeared that the emergency lighting on the building was inadequate to meet building Code requirements, and additional emergency lighting was required.

c. On cross-examination, Dickun stated that certain of the entries on the relevant exhibits related to heating, ventilation and air conditioning units.

d. According to Exhibit 61, SEI is responsible for all emergency lighting as required by the Code.

e. Similarly, according to Exhibit 61, Penn Lear is responsible for all heating, ventilating and air conditioning necessary for the building.

f. The documentary evidence presented to support the Kap Electric bill can be sufficiently separated between emergency lighting, and heating and air conditioning. Therefore, Penn Lear has proved its claim and is entitled to damages in the amount of $1,757.00.

12) *Facility Service—Electrical* ($8,486.54):

a. Dickun testified that this item represented electrical work done by Facility Service, Inc.

b. Dickun testified that he arranged for this work to be done because the electrician that SEI had engaged did not come forward to do the work, and time was of the essence.

c. On examination of the invoices, they appear to include emergency lighting, outside lighting and entrance lighting; and also heating, ventilation and lighting for the rest rooms.

d. As stated previously, SEI is responsible for the electrical services and Penn Lear is responsible for the heating and ventilating services. While the amounts charged for materials are sufficiently separate as to allow for individual calculation, the labor items have not been separated as to electrical work performed and heating/air conditioning work performed.

e. Therefore, Penn Lear has proved damages in the amount of $2,926.80.

13) *Additional Billing From Schultheis* ($8,450.00):

a. Upon examination of these invoices, it appears they are duplications of invoices that have been supplied to the Court under Item H., *infra.* Therefore, there can be no award for these items, as any award therefore will be included in Item H.

14) *Facility Service, Inc.—Bills Paid By Penn Lear* ($12,237.76):

a. During testimony on this item, it was admitted that these bills represent duplications of items listed in the numbered entries previously discussed. Therefore, the amount requested is included in the awards listed above and no award can be made for this item.

**H. Roof Repair and Heating and Ventilating Services Performed Since February–1985 ($7,934.50)**

1) Dickun offered into evidence a series of bills received from Schultheis Brothers, as a result of roof repairs conducted on the Murrysville property from and after the February 27, 1985 date to the date of hearing. According to both the original Lease executed by and between the parties, and Exhibit 61, SEI was responsible for repair and/or replacement of the roof to eliminate leakage.

2) In examining the various invoices entered as documentary evidence for this claim, it appears that certain of the work provided relates to heating, ventilating and air conditioning, which has previously been determined to be Penn Lear's responsibility.

3) Therefore, Penn Lear has met its burden of proof on this issue as to the roof repair charges, and will be allowed a damage claim in the amount of $6,674.00.

**I. Lost Rent Revenue ($226,378.80)**

1) Penn Lear has made an additional counterclaim asserting that because the roof remained in a state of disrepair, and Westinghouse elected not to enter into its three 1–year options on said Lease, Penn Lear lost additional revenue in the amount of $226,378.80. Penn Lear asserts that had

SEI replaced and/or repaired the roof sufficiently, Westinghouse would have in fact renewed its three 1–year options on the Lease, to the financial benefit of both SEI and Penn Lear.

2) Mr. William H. Weihe, Jr., a former Facilities Operations Manager for Westinghouse, testified as to the following:

a. The building at 3MC was originally used by Westinghouse as an office facility, and was later modified in part to be an electronics laboratory.

b. The roof of the building was a continual problem from and after the winter of 1983–1984, and that the roof had not been repaired to Westinghouse's satisfaction up through the time of trial.

c. Dickun, and/or other parties representing Penn Lear, had responded to various Westinghouse complaints by providing various types of repairs; these were not the repairs recommended by Westinghouse's consultant.

d. Based upon a report by Westinghouse's consultant, Weihe believed that the roof in question needed to be covered with a rubber membrane rather than repaired in a piecemeal fashion.

e. Westinghouse contemplated occupancy for six years, rather than three years; the expenditures made by Westinghouse in the location of employees to this facility, as well as the amenities included in said facility, were based upon a 6–year occupancy.

f. The roof repairs were required at least monthly during the winter of 1983–84, and more often during the winter of 1984–85.

g. Schultheis Brothers was hired to repair the roof based upon the recommendation of Westinghouse.

h. Westinghouse invested approximately $3,000–$4,000 per work station and 3MC involved 200 work stations. Approximately $1,000.00 per work station remains at the vacated premises.

3) On cross-examination Weihe testified to the following:

a. A majority of the leaks in the roof were located in and around the vicinity of the air conditioning units. However, all areas of the roof had required some repair over the Lease period.

b. Schultheis performed the roof repairs in a commercially reasonable manner; the types of repairs varied, beginning with the simplest types of repairs and progressing to more complicated and difficult, all of which ended up being unsuccessful.

c. In 1984 Westinghouse's consultant, Risco, determined that the present roof was unsalvageable and that the appropriate choice would be to replace the roof.

d. The employees who were moved from the 3MC building were divided between another rental property on Mosside Boulevard, and Westinghouse's new nuclear center site.

e. Westinghouse had made plans not to renew the lease at the 3MC property at least one and one-half (1½) years prior to the expiration of same, and had indicated same to Penn Lear. Weihe testified that the primary reasons for the plans to vacate the property were the dissatisfaction with the roof and the damage that Westinghouse sustained to its own investment in the ceiling and furnishings.

f. The lease on the Mosside property was a 5–year lease which began one and one-half (1½) years ago, had three and one-half (3½) years to run, and began at about the same time that Weihe testified Westinghouse determined to vacate the property at 3MC.

g. Much of the movement of employees by Westinghouse from 3MC to Mosside Boulevard and the nuclear center, was due to realignment and reallocation of personnel. The additional space at the nuclear center was completed and ready for occupancy in April of 1986; the building was not under construction or being considered at the time of the execution of the Lease on the 3MC property.

h. The property at Mosside Boulevard is approximately 100,000 square feet, and involves five 1–year options.

4) The evidence presented by Penn Lear is not sufficient to meet its burden of proof on this count, as Penn Lear has not proved

by a preponderance of *the* evidence that SEI's default upon its obligations was *the* reason for Westinghouse's early departure from the Lease. Rather, there is substantial evidence that the massive additional space available at the Mosside Boulevard location and the nuclear site played some significant part in Westinghouse's reorganization. Additionally, significant testimony was not brought forward. The testimony and the exhibits indicate that many other Westinghouse employees were involved in the decision not to renew the Lease. Some of these people could have testified with specificity as to the developments, positive and negative, which led to this move. Penn Lear did not produce these people to testify. The witness offered by Penn Lear had previously retired from Westinghouse's employ and could not state with certainty the motivating factor for Westinghouse's decision to refuse to renew. The Court is certain the reason is discernable, and equally certain that witnesses with the good evidence were not offered by the party with the burden of proof. As such, Penn Lear may not collect on its claim in this particular matter.

## CONCLUSIONS OF LAW

■ 1. Leases are in the nature of contracts and therefore, are similarly controlled by contract law principles, including interpretation and construction. *2401 Pennsylvania Avenue Corporation v. Federation of Jewish Agencies*, 319 Pa.Super. 228, 466 A.2d 132 (1983); *Cusamano v. Anthony M. DiLucia, Inc.*, 281 Pa.Super. 8, 421 A.2d 1120 (1980).

■ 2. The Court must determine the intention of the parties by examining the entire contract, not just specific portions thereof. *International Organization Master, Mates & Pilots of America, Local No. 2 v. International Organization Master, Mates & Pilots of America, Inc.*, 497 Pa. 102, 439 A.2d 621 (1981); *Laub v. Laub*, 351 Pa.Super. 110, 505 A.2d 290 (1986). Therefore, this Court has considered the entire printed contract, and Exhibit 61, which was part of the Lease at the time of execution.

3. The Court will neither create nor alter the terms of a written contract; this Court will not disregard any clause from which reasonable meaning can be ascertained. *Schreiner v. City of McKeesport*, 512 Pa. 412, 517 A.2d 906 (1986); *Harris v. Dawson*, 479 Pa. 463, 388 A.2d 748 (1978); *CBS, Inc. v. Capital Cities Communications, Inc.*, 301 Pa. Super. 557, 448 A.2d 48 (1982).

■ 4. If the intention of the parties is not clearly ascertainable from the document itself, the Court may use extrinsic evidence to aid its interpretation. *Northbrook Insurance Company v. Kuljian Corporation*, 690 F.2d 368 (3rd Cir.1982); *Celley v. Mutual Benefit Health Accident Association*, 229 Pa.Super. 475, 324 A.2d 430 (1974); *Beharry v. Mascara*, 101 Pa. Cmwlth. 582, 516 A.2d 872 (1986); *Comm. Dept. of Transp. v. Bracken Construction Company*, 72 Pa.Cmwlth. 620, 457 A.2d 995 (1983).

■ 5. The standard for interpretation is the meaning of words used by the parties at the time and place of contracting. In the absence of indication that certain words hold special meaning, they will be given their plain and ordinary meaning. *D'Orazio v. Masciantonio*, 345 Pa. 428, 29 A.2d 43 (1943); *Rothstein v. Aetna Insurance Company*, 216 Pa.Super. 418, 268 A.2d 233 (1970).

■ 6. A contract is ambiguous only if it is reasonably susceptible of more than one construction. A contract is not made ambiguous merely because the parties disagree as to the proper construction. *Rosenberg v. Rosenberg*, 323 Pa.Super 293, 469 A.2d 626 (1983); *Merriam v. Cedarbrook Realty, Inc.*, 266 Pa.Super. 252, 404 A.2d 398 (1978); *Comm. Dept. of Transp. v. Gramar Construction Company*, 71 Pa. Cmwlth. 481, 454 A.2d 1205 (1983).

■ 7. When a contract consists of parts both handwritten and form printed, the handwritten words are to be given greater weight, as they presumably constitute the deliberate and clear intent of the contracting parties. *Onofrey v. Wolliver*, 351 Pa. 18, 40 A.2d 35 (1944); *Woytek v.*

*Benjamin Coal Company,* 300 Pa.Super. 397, 446 A.2d 914 (1982); *Cusamano v. Anthony M. DiLucia, Inc., supra.* Therefore, where handwritten language appears, such as the initials on Exhibit 61, that is either clear and unambiguous on its face, or is made clear through extrinsic evidence, this Court provides it substantial weight in determination.

■ 8. If a contracting party, at the request of the other contracting party, does work in addition to that required under the contract, he is entitled to compensation therefor. *Exton Drive–In, Inc. v. Home Indemnity Company,* 436 Pa. 480, 261 A.2d 319 (1969), *cert. den'd,* 400 U.S. 819, 91 S.Ct. 36, 27 L.Ed.2d 46; *Gramar, supra.* As both parties performed work over and above that which they were required, both parties are entitled to compensation.

■ 9. A contract provision requiring written authorization for the performance of additional work may be waived by the conduct of the contracting parties. *Universal Builders, Inc. v. Moon Lodge, Inc.,* 430 Pa. 550, 244 A.2d 10 (1968); *Campbell–Ellsworth, Inc. v. Holy Trinity Serbian Orthodox–School Congregation,* 233 Pa. Super. 126, 336 A.2d 346 (1975). Both SEI and Penn Lear waived said contractual provision by their mutual conduct.

■ 10. The modification of a written contract may be accomplished by a later oral agreement; however, such a modification must be supported by valid consideration. Oral modification is possible, even when the written contract specifically forbids parol modification. The subsequent modification of a contract must be clearly established by precise and convincing evidence, especially where the written contract prohibits oral modification. *Nicolella v. Palmer,* 432 Pa. 502, 248 A.2d 20 (1968); *Universal Builders, supra; Bonczek v. Pascoe Equipment Company,* 304 Pa.Super. 11, 450 A.2d 75 (1982); *Douglas v. Benson,* 294 Pa.Super. 119, 439 A.2d 779 (1982); *Edelstein v. Carole House Apartments, Inc.,* 220 Pa.Super. 298, 286 A.2d 658 (1971); *Donahue v. R.C. Mahon Company,* 219 Pa.Super. 210, 280 A.2d 563

(1971). The facts of this case convince this Court that Penn Lear offered to repay the original cost of the sprinkler system if and when it exercised the optional three 1–year leases. This was valid consideration for the oral modification of the original lease.

■ 11. A breach of contract is the non-performance of a contractual duty or violation of such an obligation. *Johnson v. Fenestra, Inc.,* 305 F.2d 179 (3rd Cir.1962); *Just Manufacturing Company v. Falck,* 354 Pa. 421, 47 A.2d 659 (1946); *Camenisch v. Allen,* 158 Pa.Super. 174, 44 A.2d 309 (1945).

■ 12. If both contracting parties materially breach the contract, recovery, by either party, is limited to that benefit which is in excess of the loss said party has caused by his own breach. *Lancellotti v. Thomas,* 341 Pa.Super. 1, 491 A.2d 117 (1985). SEI breached the contract by not properly caring for and repairing those items (including the roof) for which it was responsible. Penn Lear breached the contract by its refusal to make the requisite rental payments in a timely fashion.

■ 13. In proving damages, inability to break down a lump sum proof of extra costs justifies denial of any recovery if some part of said added costs was chargeable to a non-actionable cause. *Lichter v. Mellon–Stuart Company,* 305 F.2d 216 (3rd Cir.1962). SEI and Penn Lear have both included such "lump sum" claims, not properly chargeable to the other party, which have been denied.

14. The party asserting the modification of a contract has the burden of proof. *Aluminum Company of America v. Essex Group,* 499 F.Supp. 53 (W.D.Pa.1980); *Knight v. Gulf Refining Company,* 311 Pa. 357, 166 A. 880 (1933). The modification burden has been met.

15. The party having the burden of proof must sustain the burden by a preponderance of the evidence. *Ragnar Benson, Inc. v. Bethel Mart Associates,* 300 Pa.Super. 405, 454 A.2d 599 (1982).

16. The burden of proving a breach of contract is on the asserting party. *Shafer*

*v. A.I.T.S., Inc.*, 285 Pa.Super. 490, 428 A.2d 152 (1981); *Henderson & Brothers v. Call*, 84 Pa.Super. 372 (1925). Both parties have sufficiently proved the other's breach of the Lease Agreement.

17. A person of legal age is presumed to know the meaning of words in a contract, and if, relying upon his own ability, he entered into an agreement not in his best interest, he cannot later be heard to complain that he was not acquainted with its contents and did not know the meaning of the words used in the instrument that he signed. *Tose v. First Pennsylvania Bank*, 648 F.2d 879 (3rd Cir.1981); *Brokers Title Company, Inc. v. St. Paul Fire & Marine Insurance Company*, 610 F.2d 1174 (3rd Cir.1979); *Estate of Brant*, 463 Pa. 230, 344 A.2d 806 (1975); *T.W. Phillips Gas & Oil Company v. Kline*, 368 Pa. 516, 84 A.2d 301 (1951). *Schoble v. Schoble*, 349 Pa. 408, 37 A.2d 604 (1944); SEI, having executed the original Lease, is bound thereby. His statements that "The lease wasn't the deal" are of no relevance. Similarly, Dickun's acceptance of responsibility for heating, ventilating and air conditioning, on Exhibit 61, meant all heating, ventilating and air conditioning. That the system required more work than he anticipated is equally irrelevant.

18. Damages need not be proved to a mathematical certainty. The damage claim may be estimated if there exists relevant supporting data. *Delahanty v. First Pennsylvania Bank*, 318 Pa.Super. 90, 464 A.2d 1243 (1983). For those claims in which supporting data was available, and convincing, the damages are awarded. For those claims in which there was irrelevant, insubstantial or nonexistent data, damages are disallowed.

A Proposed Order of Court will be entered and submitted, along with this Court's Proposed Findings of Fact and Conclusions of Law, to the U.S. District Court for final determination.

At Pittsburgh in said District this 30th day of July, 1987.