439 A.2d 779

**James W. DOUGLAS, George P. Heilig and Blair F. Green,**

v.

**John BENSON, Jr., A/K/A John W. Benson, Jr., and John H. McCann, III, T/D/B/A Benson Associates, A Pennsylvania Partnership.**

Superior Court of Pennsylvania.

Argued Nov. 11, 1980.

Filed Jan. 5, 1982.

120

Edward J. Steiner, Kittanning, for appellants.

Blair F. Green, Kittanning, for appellees.

Before HESTER, BROSKY and VAN der VOORT, JJ.

VAN der VOORT, Judge:

The appellants are the lessees and the appellees the lessors of two adjacent tracts of coal land in Armstrong County known as the Lawson and Douglas properties. The appellees have cancelled the lease because of defaults in appellants' performance, and have filed suit in assumpsit to recover sums payable by the terms of the contract.

The appellants have counter-claimed, alleging alternatively (1) that they should recover extra costs incurred in performing under the contract because of material misrepresentations by the appellees as to over-burden and quality of coal, or (2) that they are entitled to recover that portion of their expenditures which were allegedly agreed upon in settlement negotiations which preceded this litigation.

The case was tried in the Court below by President Judge House, sitting without a jury. The Judge has filed a narrative summary of his Findings of Fact and Conclusions of Law to the effect that there were no material misrepresentations and no settlement agreement. He has found that the appellees are entitled to recover $29,516.54 in net earned royalties and $34,714.38 in trucking services rendered the appellants, a total of $64,230.92. He has also found that the appellants are entitled to recover the sum of $12,200 advanced by the appellants to the appellee Douglas as a loan but not repaid. Verdicts were returned in these amounts, exceptions were heard and overruled, and judgment was entered in the amounts found in the verdicts. The appellants have appealed because of the failure of the Court to grant the relief requested in their counter-claim.

The written contract between the parties, dated March 5, 1976, leased to the appellants the right to mine all mineable and merchantable coal found under an over-burden of no

more than eighty (80) feet at a royalty of $3.00 per ton, and $2.50 per ton where the coal was under an over-burden of more than eighty (80) feet. The appellants were to pay a minimum royalty of $5,000 per month beginning April 1, 1976, whether or not coal was mined, such payments to be credited against future earned royalties. They were also to pay all engineering and drilling costs in mining the properties. The agreement stated that the appellants had been given "all maps, charts, graphs, records, analysis sheets, engineering reports, etc. relating to the Lawson property and the Douglas property." Appellants were also given the right to use and remodel at their own expense a railroad station adjacent to the Douglas property.

The appellants were obligated to commence mining operations on the Lawson tract within 90 days and to have in place by that time a six yard drag-line, bulldozers, pan and highlifts, as well as all other other necessary mining equipment. The appellee Douglas was given a first option to provide truck transportation for coal mined by the appellants under the agreement up to a total of six trucks, and he was also to be employed as an assistant superintendent at a salary of $300 per week as of the date of commencement of mining operations on the Lawson property.

On January 26, 1976, in anticipation of the agreement which materialized in March, the appellant Benson delivered to the appellee Douglas a check for $12,200 marked "Railroad Building" and a check for $45,000 marked "pre-paid drilling—Lawson". No contemporaneous writing explained this transaction, and the evidence at the trial on these items was conflicting.

There had been an earlier contract between the parties dated November 5, 1975, granting the appellants the right to mine the Lawson property. Negotiations leading to the earlier agreement were begun in August, 1975, and the appellants made a $50,000 payment to the appellees at that time, characterized on the check as "Advanced Royalty on Lawson Properties." No mining operations were commenced by the appellants within the 30 days required by the

November contract, and on January 14, 1976, it was terminated by the appellees because of the default. The 50,000 advance payment was not returned. Shortly thereafter, the parties began oral negotiations to renew their contractual relationship and the March contract resulted.

The appellants defaulted on their commitment under the March agreement to have in place on the Lawson property the mining equipment called for by the contract, and to begin mining that property within 90 days of the date of the agreement. However, the appellants did begin mining operations on the adjacent Douglas tract within the 90-day period by the employment of a contract stripper. These operations continued until an unspecified date in September, 1976. Appellees also paid the minimum royalty of $5,000 a month beginning with an April 1st payment.

Both parties were dissatisfied with operations under the contract. They met in mid-August, 1976, to discuss the basis for ending the contract, returning the properties to the appellees, and stating an account between the parties. Appellants wanted a return of the funds advanced to the appellees and compensation for blasting expense and their loss of a down payment on a drag-line which appellants determined to be unusable on the Lawson property. The appellees wanted payment for coal mined in August and September and for the trucking services rendered by them in hauling that coal for the appellants. No understanding was reached as to the amounts due under either set of claims, but there was discussion and, appellants claim, an agreement to the effect that the account between them should be determined by a neutral accountant or by arbitration.

At this point, appellants undertook to reduce these discussions to a written agreement, and submitted a written draft to the appellees on September 8, 1976. In addition to providing for a return of the properties to the appellees, the draft of agreement provided that the appellants were entitled to $70,000 from which should be deducted the money due the appellees for earned royalties and trucking. The

appellants then refused to sign the agreement, and negotiations were broken off.

On September 27, 1976, the appellees notified the appellants that they were in default under the March agreement because of (1) their failure to place the required mining equipment on the Lawson property, (2) their failure to pay the appellee Douglas for trucking services rendered after August 1, 1976, and (3) their failure to pay the appellee Douglas $300 per week from the commencement of mining operations on the Douglas property. The appellants accepted termination of the contract as of that date and surrendered possession of the property. Promptly thereafter, the appellees brought this action in assumpsit to enforce their claims under the contract.

The lower Court, sitting without a jury, heard conflicting testimony as to the intent of the parties with respect to the several sums advanced to the appellants. It made a Finding of Fact to the effect that the $45,000 paid by the appellants on January 26, 1976 was a reimbursement to the appellees for sums expended by them in test drilling on the Lawson property for the benefit of the appellants. It also found that the $12,200 advanced by the appellants to the appellee Douglas on the same day was a personal loan which had not been repaid. Both findings are fully supported by testimony. The trial judge heard the witnesses and had the opportunity to interrogate them on occasion. No contention is made on appeal that these findings were in error.

The $50,000 paid on August 8, 1975 as an advance royalty on coal mined from the Lawson property was claimed by both parties. Conflicting testimony was received as to what the parties had originally intended. However, the Court concluded that inasmuch as the later March 5, 1976 agreement had made specific provisions for the method and extent to which it could be recouped by the appellants, that contact must prevail over any earlier understanding. The contract provided:

"[Appellee] recognizes that the sum of $50,000.00 was paid by [appellant] to [appellee] as advance royalty or for

drilling and other costs of [appellee]. Without excepting any liability for repayment, [appellee] agrees that if all the conditions and terms of this contract are being performed by [appellant], [appellant] can deduct .25 cents per ton from the royalty payments due on actual coal mined from all the Douglas properties covered by this agreement when available."

The Court allowed appellants a credit of $5,410.60 at the rate of $.25 per ton on royalties due on 21,642.38 tons mined by the appellants. This finding is not challenged on appeal except by appellants' contention that the contract was superseded by the settlement negotiations hereinafter considered.

The Court recognized that this determination involved a forfeiture of the balance of the payment but commented:

The Court must recognize that these parties were all experienced in coalfield transactions and that they dealt at arm's length. Although the bargain finally struck in March, 1976 may now appear to defendants to have been a bad bargain or even a one-sided bargain, there must have been good and sufficient reason for them to enter the agreement at the time it was made. The Court makes these observations only to point up the fact that we must interpret and enforce the bargain as made and not as it could have been made or as defendants or plaintiffs may wish that it had been made.

The Court further found that $29,516.54 was due the appellees as royalties on coal mined after crediting the appellants with the monthly advance royalty payments and the $.25 per ton credit above referred to. The Court also found that $34,714.38 was owing to the appellees for trucking services, a total due appellees of $64,230.92. The Court likewise awarded the appellants the sum of $12,200 on the finding that this sum was advanced to the appellee Douglas as a loan on January 26, 1976 but had not been repaid. None of these findings are questioned on appeal.

The appellants contend that they should have been awarded a judgment based on their counter-claims (1) that the

appellees materially misrepresented the quality of the coal to be mined and the nature of the over-burden, which misrepresentations caused them additional expense, and (2) that the settlement discussions of August 1976 amounted to a verbal amendment of the March contract which had the effect of substituting its terms for those of the contract.

The misrepresentations relied upon are said to have been made by the appellee Douglas prior to the signing of the contract, to the effect that the coal would have an average heat content of 14,000 B.T.U., that it would be low in both sulphur and ash, and that it would be a superior coking coal, mineable by stripping with no rock over-burden, all in all "the best coal in Pennsylvania".

The appellants offered extensive evidence in support of their contention that they had been misled by the appellee Douglas as to the nature and extent of the over-burden and as to the quality of coal to be mined. This evidence was disputed by the appellees. The trial Court heard and, on occasion, interrogated the witnesses. It came to the conclusion that any statements made by Douglas were made as a description of the coal and were not intended to be representations as to its suitability to the appellants' needs. It likewise found that there had been no reliance on representations by Douglas as to the amount or quality of coal, the amount of over-burden, or the presence or absence of rock in the over-burden.

These findings are not only supported by testimony, but are strongly corroborated by surrounding circumstances. The appellants had access to, if not possession of, the maps and drilling records of the appellees with respect to the property. They were in possession of the Lawson property under lease in November and December of 1975 under the November agreement, and had personally inspected the property at that time. The appellants were experienced coal operators, the owners and principal officers of Kitt Coal Company which was engaged in buying, washing, blending and selling coal of various grades to large customers.

The Court's holding that there had been no misrepresentations made to the appellants concerning the over-burden or the quantity or quality of coal finds definitive confirmation in Paragraph 24 of the March contract which provided:

"24. *Integration clause.* This is the entire agreement between the parties, covering everything agreed upon or understood in the transaction. There are no oral promises, conditions, representations, understandings, interpretations or terms of any kind as conditions or inducements to the execution hereof, or any in effect between the parties. No change or addition is to be made to this Agreement, except by written agreement executed by the party to be charged."

■ The appellants' second argument is that the contract was verbally changed by the settlement negotiations which took place in August. That position faces both legal and factual difficulties. Legally, it is predicated upon the right to verbally amend a written agreement which contains a provision that it can only be amended in writing. While it is true that a written contract prohibiting a non-written modification may nevertheless be modified by a subsequent oral agreement, there must first be an intent to waive the contract requirement that amendments be in writing. *C.I.T. Corporation v. Jonnet,* 419 Pa. 435, 438, 214 A.2d 620, 622 (1965). Another case involving a contract of sale and purchase of real estate which contract contains a clause requiring that any amendment be in writing is *Schwoyer v. Fenstermacher,* 251 Pa. Superior Ct. 243, 380 A.2d 468 (1977). In *Fenstermacher,* a date (January 14, 1972) was set for closing and time was expressly made of the essence. The seller orally agreed to postpone the closing date until such time as the attorney (who was acting for both seller and buyer) had completed the title search. We held there that the seller by her conduct waived the requirement of the closing date being January 14, 1972 and waived the provision that time was of the essence.

While the result in *Fenstermacher* is different from that in the instant case (because the court found waiver), our

decision here (where we find no waiver) is in harmony with the ruling in *Fenstermacher*, i.e., that a party by conduct may modify a written agreement without a writing if and when his conduct clearly shows an intent to waive the provision prohibiting non-written modification.

■ Even if the lower court had accepted the appellants' contention that the parties had reached a verbal agreement, there was no evidence by anyone that the parties had consciously intended to waive the requirement that amendments must be in writing. The fact that they undertook to reduce the negotiations to writing would suggest that they did not intend to make a verbal amendment. And if the parties contemplated that their agreement was not to be considered complete until reduced to writing, no modified contract exists until the execution of that writing. *Essner v. Shoemaker*, 393 Pa. 422, 425, 143 A.2d 364, 366 (1958).

■ Nor do the facts bear out the appellants' contention that a verbal agreement had in fact been reached in August. The central question at issue, namely, the amount to be paid appellants as reimbursement for their cash advances to the appellees and for the cost of blasting rock over-burden and making a down payment on a drag-line, was not answered. The negotiations got no further than the concensus that the matter might have to be referred to a neutral accountant or to arbitration for resolution.

Even if it were accepted that the appellees had agreed to that procedure, subsequent events demonstrated that the appellants had not agreed. When the appellants undertook to reduce the verbal discussions to a written agreement, they ignored third party adjudication and substituted $70,-000 as their claim, and stuck to that position until the appellees called off negotiations, gave notice of cancellation and entered suit. While it would be possible for verbal negotiations to become a binding commitment before being reduced to writing, there must be a mutual agreement as to the negotiated terms.

Plainly the parties undertook to reach a written agreement amending the contract terms, but failed to do so. Equally evident, the written document which followed the negotiations demonstrates that the parties had not reached a verbal agreement on the most fundamental aspect of the negotiations, namely, the payment of money.

As a consequence, the court found that the contract had not been verbally amended in the August negotiations, and determined the amounts payable to each party under the terms of the March 5 contract. We reach the same conclusion.

Affirmed.