The PENN MUTUAL LIFE
INSURANCE COMPANY

v.

BANK OF NEW ENGLAND CORPORA-
TION, and BNE Massachusetts
Corporation.

Civ. A. No. 90–1330.

United States District Court,
E.D. Pennsylvania.

Feb. 1, 1991.

Jami McKeon, Philadelphia, Pa., for plaintiff.

David H. Pittinsky, Philadelphia, Pa., for defendants.

## OPINION

DITTER, District Judge.

Pursuant to Federal Civil Procedure Rule 56, plaintiff seeks summary judgment on Count I of its complaint alleging breach of a note agreement. Having considered the parties' memoranda, supplemental memoranda, replies, surreplies, counter-replies, and oral argument, I will grant plaintiff's motion.

## I. FACTS

### A. The Note Agreement

On July 12, 1984, Penn Mutual ("PM") loaned The Conifer/Essex Group ("Conifer") $10,000,000.00. The parties signed a note agreement setting forth a repayment schedule and both affirmative and negative covenants and Conifer signed a separate note evidencing its promise to repay.

The affirmative covenants in the note agreement included, of course, repayment of principal and interest. These covenants also required Conifer to prepare and deliver various financial reports at stated intervals.[1] *See* note agreement, section 5. The negative covenants precluded, among other things, any mergers unless the surviving company assumed all of the agreement's obligations and those of the note. *See* note agreement, section 6(c).

The agreement specifically provided that violating any covenant would constitute an event of default and also required the debtor's timely notice of any default. *See* note agreement, pg. 20–2. Upon default, the agreement allowed acceleration of all outstanding payments, including a premium on the unpaid principal, and all reasonable costs and expenses. *See* note agreement, pg. 22–3.

In addition, the note agreement contained a clause headed Waivers, Consents, and Modifications. In pertinent part it said: "No modification of any provision of this Agreement or of the Notes shall be effective unless made in writing by the Company and the holders of the required percentage of the unpaid principal amount of the Notes." Note agreement, pg. 49.

### B. The Breach

According to plaintiff, the breach occurred when BNE Massachusetts Corporation ("BNE Mass") failed to satisfy the note agreement's reporting requirements following its acquisition by merger of Conifer. BNE Mass is a wholly owned subsidiary of the Bank of New England Corporation ("BNE") and a holding company for a number of banks. BNE Mass assumed all of the agreement's obligations and covenants.

BNE Mass, however, made none of the required reports for almost three years.

Instead BNE sent information as though it was the company that had acquired Conifer. In January, 1990, PM learned that BNE Mass was actually the debtor. Of course, this revelation highlighted the previous reports' deficiencies. At about the same time, BNE Mass's financial position deteriorated markedly.

Worried about repayment, PM demanded all outstanding financial reports concerning the merger and BNE Mass' subsequent financial health. BNE Mass refused to produce many of these documents for varying reasons, and as a result, PM never received certified quarterly and audited annual consolidated financial statements, statements and certificates from BNE Mass's chief financial officers or independent accountants, and some consolidated, unaudited statements.

Despite the fact that all payments of principal and interest had been timely made, on February 21, 1990, PM declared default on the basis of BNE Mass' failure to provide financial reports. In accordance with the agreement's acceleration provisions, PM sought immediate payment and now moves for summary judgment against BNE Mass claiming the facts and defendant's own admissions indicate a breach as a legal matter.

## II. DISCUSSION

Summary judgment is not a disfavored procedural shortcut, but an integral part of the federal rules which are designed to secure the just, speedy, and inexpensive determination of every action. Summary judgment should be granted if there is no genuine issue of material fact and a party is entitled to prevail as a matter of law. A dispute as to an immaterial fact cannot preclude an entry of summary judgment. An issue is genuine if a reasonable factfinder, considering the evidence presented,

---

1. Among these reports, which were to comply with generally accepted accounting principles, were: (1) a consolidated balance sheet of the note holder and all of its subsidiaries, (2) a consolidated statement of the note holder's income, financial position, and changes in stockholders' equity, (3) audited, year-end, consolidated financial statements for the note holder, (4) year-end certification by an independent public accountant that the note holder was not in default on any of the terms of the note agreement, (5) copies of reports and communications intended for stockholders, and other public documents and filings (e.g. SEC and Federal Reserve documents).

could find for the non-moving party. In considering a motion for summary judgment, I may not determine the quality of the evidence and must consider it in a manner most favorable to the opposing party.

Plaintiff contends the undisputed facts show defendants' breach. Defendants raise two equitable defenses, waiver and substantial performance, and the legal defense that Penn Mutual prematurely accelerated the note. Defendants' arguments fail. They cannot overcome the note agreement's performance and modification clauses. Secondly, while defendants present some interesting facts in their substantial performance claims, they can neither sidestep the fact that the agreement's reporting requirements are material provisions nor can they satisfy the clean hands doctrine. Finally, defendants' legal claim of premature acceleration is without merit.

### A. Defendants' Waiver Argument

■ Defendants first assert that PM has waived its rights under the agreement's reporting provisions. Defendants note that PM received BNE's reports for almost three years without complaint that the information was inadequate or from the wrong source. Defendants add that a number of the documents specifically mentioned that Conifer had merged into "a wholly owned subsidiary of BNE." *See* defendants' June 20, 1990, memorandum, page 21 and exhibits attached. From these facts, defendants construct the following argument:

1. PM knew that BNE reports were not BNE Mass reports;

2. PM accepted the reports for three years;

3. BNE relied on this behavior and continued to send BNE reports; and

4. Through its forbearance, PM waived its right to insist on receiving BNE Mass documents.

### B. Agreement Contains Both Performance and Modification Provisions

BNE Mass first contends PM waived its right to the reports and cannot now assert it. This argument fails because there was no waiver. The note agreement provided that any modification of its terms must be in writing. Here there was no such writing and there was no waiver of the provision that required such a writing.

It is true, of course, that a written contract can be modified by subsequent oral agreement or by subsequent conduct. Nonetheless, when they contract explicitly says that modifications must be in writing, there is a substantial barrier to one seeking to show modification by subsequent conduct. Whether a contract is modified by subsequent conduct or not has come before Pennsylvania courts in a variety of factual situations. Not surprisingly, Pennsylvania authority is splintered on how the contention should be handled when it is made to attack a contract that provides it can only be modified in writing.

In *Nicolella v. Palmer*, 432 Pa. 502, 248 A.2d 20 (1968), the court said: "... where the writing contains an express provision that it constituted the entire contract between the parties and should not be modified except in writing, the party seeking to show subsequent oral modification in the agreement must prove it by clear, precise, and convincing evidence, as in cases where fraud, accident, or mistake is alleged." P. 508, 248 A.2d 20. This test is adopted in *First National Bank of Pennsylvania v. Lincoln National Life Insurance Company*, 824 F.2d 277, 280 (3d Cir.1987), a case where the court found a life insurance contract modified by subsequent conduct.

The test is expressed somewhat differently in *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 430 Pa. 550, 244 A.2d 10 (1968): The requirement that a modification be in writing will be considered waived if its enforcement would result in something approaching fraud. Thus the effectiveness of such a provision depends upon whether enforcement is or is not barred by equitable considerations, not upon the technicality of whether the condition was or was not expressly and separately waived before the non-written modification.

*Douglas v. Benson,* 294 Pa.Super. 119, 439 A.2d 779, 783 (1982), follows *CIT Corp. v. Jonnet,* 419 Pa. 435, 438, 214 A.2d 620 (1965), and requires a two-step analysis. First, the court must check to see if there was any intent to waive the contract requirement that all modifications be in writing. Second, only if there was, need the court examine the conduct of the parties to see if there was a waiver of the performance required by the contract.

In this case, the result is the same no matter which analysis is followed. Under the *Nicolella–First National Bank* analysis, PM's forbearance would not amount to clear, precise, or convincing evidence that this agreement was modified. There is no suggestion that the enforcement of the contract as written would result in something approaching fraud as *Universal Builders* requires, and following the *Douglas v. Benson* analysis there clearly was no intention on PM's part to waive the non-modification clause.

As a subsidiary argument about the agreement's requirement that all modifications be in writing, defendants contend that this language can be ignored because it is "mere boilerplate." Nothing could be further from the truth. The characterization of language as being boilerplate does not mean it is unimportant. The term simply refers to language that has been used repeatedly, language that has been refined and perfected in the judicial mill so that its meaning is known and accepted. The use of boilerplate language avoids the need for redrafting, reduces the chance of error, and gives certainty to the intentions of the parties. The parties in this case are sophisticated business entities. There has been no suggestion that they were not represented by experienced, competent counsel at every step of the way. They chose language that the courts have examined on many occasions. To suggest that this language should be cast aside because its meaning is well-known is more courageous than persuasive.

The requirement that modifications be in writing precludes the waiver defense made here.

## C. The Equitable Waiver Issue

 Even if the parties' agreement did not explicitly require all modifications be in writing, summary judgment for the plaintiff would still be required because defendants' waiver-by-forbearance argument fails in and of itself. "[I]t is clear that under Pennsylvania law the doctrine of implied waiver applies to situations involving circumstances equivalent to an estoppel ...." *Consolidated Rail Corp. v. Delaware & Hudson Ry. Co.,* 569 F.Supp. 26, 29 (E.D.Pa.1983). As defendants point out, there are two elements involved: inducement and justified reliance on that inducement. The party asserting the estoppel has the burden of establishing both points.

Defendants, however, are wrong when they assert these are the *only* elements of an estoppel claim. Estoppel is an equitable doctrine which "requires innocent reliance by the person seeking the estoppel upon the conduct or representations of the adverse party." *See Lockwood v. Zoning Hearing Board,* 115 Pa.Cmwlth. 368, 540 A.2d 336, 339 (1988). In a widely cited opinion, the Pennsylvania Supreme Court put it this way:

> There can be no equitable estoppel where the complainant's act appears to be rather the result of his own will or judgment than the product of what defendant did or represented. The act must be induced by, and be the immediate or proximate result of, the conduct or representation, which must be such as the party claiming the estoppel had a right to rely on.... Where there is no concealment, misrepresentation, or other inequitable conduct by the other party, a party may not properly claim that an estoppel arises in his favor from his own omission or mistake.

*In re Estate of Tallarico,* 425 Pa. 280, 228 A.2d 736, 741 (1967).

As *Tallarico* plainly demonstrates, a party cannot create his own estoppel claim. It must arise from what the other party does or fails to do. Like all other equitable principles, estoppel requires the party seek-

ing relief to come forward with clean hands. Here BNE Mass has not done so.

It is true that PM accepted BNE's reports for almost three years without complaint, but BNE can hardly claim it clearly communicated the true relationship between Conifer and BNE Mass. In the first place, BNE chose a confusing, almost identical name (BNE Mass) for its subsidiary. Secondly, BNE hid its vague merger references in multi-page documents, making the notification look more like an adverse party's document production than acceptable reporting under section 5(f) of the agreement. Most important of all, BNE forwarded the information that PM could reasonably have expected would be coming from Conifer's successor.

Defendants' own brief characterizes their reporting procedures as creating "obvious ambiguity." Defendants' June 20, 1990 brief, pg. 10. Obvious ambiguity, though, is no substitute for the agreement's clear mandate. Section 5(f) requires the note holder to file certain reports, and 5(g) requires an officers' certificate with each payment "stating that ... the Company is not to the knowledge of the signers in default in the performance of any obligations under this Agreement or specifying each default of which the signers, or either of them, have knowledge." *See* note agreement, section 5(g), pg. 11–12. By their own admissions, defendants have violated both of these covenants.

There are only two possible explanations. Either BNE purposely avoided the agreement's reporting covenants or its deficient reporting resulted from negligence. If BNE made a conscious decision to withhold information from PM, estoppel is most certainly out of the question because the ultimate cause of any waiver would be BNE's own actions, and it would not be an innocent party. *See Lockwood*, 540 A.2d at 339. Alternatively, if BNE was mistakenly producing the wrong documentation, estoppel is no defense because BNE buried the information that Conifer had merged with BNE Mass so deeply that PM could not have been expected to learn the truth and protect itself.

In fact, at least two internal memoranda produced during discovery suggest that BNE made an affirmative decision to violate the reporting covenants. These include a scribbled notation on an internal compliance checklist and remarks in a February 27, 1989, memorandum concerning debt compliance. *See* Exhibit G to Plaintiff's May 18, 1990 memorandum.

For these reasons, I conclude defendants did not innocently rely on PM's conduct. PM's conduct flowed directly from the confusion BNE and BNE Mass created. As a result, if anyone is estopped, it is BNE Mass from asserting that PM has created an implied waiver.

Section 12(b) of the agreement says that modifications must be written. There was no writing, and therefore, I find that there was a breach of the reporting requirements of section 5(f).

### D. Substantial Performance

Defendants' next argument is that by making all payments of principal and interest they have substantially performed the agreement. They claim their failure to meet the reporting requirements was an immaterial breach that did not justify plaintiff's declaration of default. To make their point, defendants draw on a number of candid discovery responses. Close inspection, however, reveals fundamental, insurmountable problems with their argument.

The crux of defendants' substantial performance contention is that the agreement concerned the lending and repayment of money: repayment was a material obligation, financial reporting was not. Defendants conclude, then, that their previous timely payments render the previous reporting provisions unenforceable. As a result, they claim they have substantially performed their obligations. Defendants add they have also cured their default by providing the correct information upon PM's request.

For support, defendants point to what they consider rather significant discovery responses obtained during depositions of PM officials. These responses include:

Barbara Bright's [2] reference to the reporting provisions as "mere boilerplate," Ms. Bright's admission that the reporting covenants did not appear on the list of key covenants that PM kept to describe each of its notes, Ms. Bright's admission that she had no system for determining whether debtors were complying with reporting procedures, and Joseph Valdaro's [3] admission that he instructed Bright to find something wrong with the covenants or sell the note only after he learned about BNE's financial problems.

In addition, defendants show convincing evidence that PM ignores the reporting covenants for other debtors holding similar notes.

Defendants garner up all of these facts, and apply them to two cases. Defendants first cite *Dempsey v. Stauffer,* 312 F.2d 360 (3d Cir.1963), for the proposition that a court can negate even a written contract provision under the substantial performance doctrine. In *Dempsey,* a man and his wife contracted to buy a diner from another couple. The buyers were to pay the debt in weekly installments with five percent interest, as well as all taxes, and sewer and water rents. In addition, the contract included a default clause which allowed the seller to terminate the deal if the buyer missed any payments. Once all of the payments were made in full, the sellers were to deliver a special warranty deed.

A little more than a year passed during which the buyers made every payment to the sellers. They did not, however, make the tax or sewer and water rent payments. The sellers declared default, and resold the diner to a third couple.

The court held for the original buyers despite the default clause. Citing the Pennsylvania Supreme Court,[4] the *Dempsey* court wrote:

> From the strict *legal* standpoint the creditor is entitled to enforce the forfeiture according to the terms of the contract, but *equity* or a court administering equitable principles under legal forms, will not permit him to do so if by lulling the debtor into a false sense of security he has led him into a default which otherwise the debtor may have avoided. *Dempsey,* 312 F.2d at 363 (emphasis in original).

There is no question that substantial performance is alive and well in Pennsylvania.

Defendants also cite *Cimina v. Bronich,* 517 Pa. 378, 537 A.2d 1355 (Pa.1988), a similar case, for its test of whether contract covenants are material or not.[5] In *Cimina,* two businessmen signed a lease with options for renewal or purchase. Another term required the tenant to pay real estate taxes on the property. After about ten years of accepting timely rent payments, the lessor decided the deal was a bad one and asserted the tenant's failure to pay the taxes was a breach.

Using the same language as *Dempsey,* the *Cimina* court held for the tenant. The *Cimina* court decided the tax term was immaterial, and reasoned that because the landlord lulled the tenant into a false sense of security, there was substantial performance. Defendants claim that applying the *Cimina* test in the instant case, reveals several questions of fact about whether the reporting covenants are material.

*Cimina* does not help BNE Mass because the materiality of the reporting re-

---

2. Barbara Bright was PM's Assistant Vice President responsible for monitoring the note.

3. Joseph Valdaro was Ms. Bright's supervisor.

4. *Warren Tank Car Co. v. Dodson,* 330 Pa. 281, 199 A. 139 (1938).

5. When the Pennsylvania Superior Court heard this case, it set out the five relevant factors for deciding whether a contract covenant was material.

1. The extent to which the injured party can obtain the substantial benefits it reasonably expects.
2. The extent to which the injured party can be compensated for the breach.
3. The extent to which the breaching party has performed, or prepared to perform.
4. The relative burden on the breaching party if the contract is terminated.
5. Whether the breach resulted from wilful neglect or an innocent mistake.

*See Cimina v. Bronich,* 349 Pa.Super. 399, 503 A.2d 427 (1985).

quirements is not an open question. By their agreement, the parties deemed these obligations were material. The agreement provided that the debtor's failure to make reports would constitute an event of default. Wherever the test of *Cimina* might lead when applied to the facts here is not important. The important thing is that the parties agreed in advance that the financial reporting requirements were material obligations and none of the events that defendants point to, singly or in combination, suggest any justification for setting aside their choice and substituting someone else's judgment as to materiality. Yet, even if the reporting provisions were not material, defendants' substantial performance argument would still fail.

Substantial performance is an equitable doctrine, and it requires innocence from the party raising it. BNE Mass, however, cannot clear this threshold hurdle. The *Dempsey* opinion explains this point in the same paragraph that defendants have quoted:

> Being an equitable doctrine, it [substantial performance] is limited by the conditions which equity imposes on those who seek its relief, and among such conditions, the most familiar—and the oldest in the history of equity jurisprudence—is the requirement that he who seeks equity must do equity. *Dempsey*, 312 F.2d at 363.

*Cimina*, too, makes this point, and so in both cases defendants cite, the breach was entirely innocent. This major distinction renders defendants' cases inapposite. BNE deliberately breached the reporting covenants, and therefore may not suggest it is the innocent victim of PM's behavior. If anyone was lulled into a false sense of security, it was PM which thought it was hearing from its debtor, not someone else.

As for defendants' cure argument, the note required various reports so that PM could monitor its debtor's financial health. Because defendants never delivered these reports there is no way to assess what PM would have done had it received them or what damage may be in store for PM in the future. For this reason, I find defendants have not cured their breach.[6]

I conclude that as a matter of law, timely payments of principal and interest did not amount to substantial performance of the note agreement.

### E. Premature Acceleration

█ Finally, defendants claim that plaintiff accelerated the note prematurely, and therefore the motion for summary judgment should be denied. Defendants point to the agreement's default section which requires PM to give the obligor 20 business days to cure a breach. Defendants explain that PM gave BNE Mass written notice of the violations on February 2, 1990, and then announced default on February 21, 1990.

There is no doubt that PM declared default only 14 days after written notice, and defendants cite cases where accelerating a note even a few hours too soon rendered the action invalid. The distinguishing feature of these cases, however, makes defendants' claim unpersuasive.

Defendants told PM that BNE Mass could not and would not produce the documents required under the note agreement. None of defendants' cases present this situation. In *Kixx v. Stallion Music*, 610 P.2d 1385 (Utah 1980), the defendant did not indicate that he could not and would not pay the note. In fact, he wrote to the plaintiff that he hoped the matter could be

---

6. On October 30, 1990, Defendants, through their attorney David Pittinsky, delivered to PM and this court various financial statements covering the period 1987 to 1988. They now submit that they have completely cured their breach because while the reporting is late, the payments were timely, and the only reason to require timely reporting was to ensure timely payment.

Plaintiff moved to strike these documents because, among other reasons, defendants present

them too late. Moreover, plaintiffs note that the reports are not verified as required under the note agreement (section 5(f)).

I agree with plaintiff that the reports are too late, but without deciding whether to strike them on that basis, conclude that because they are unverified, the reports still do not satisfy the agreement. As a result, they are not an appropriate cure.

resolved amicably. *Id.* at 1388. Similarly, in *Blackman v. Edison*, 31 Misc.2d 746, 221 N.Y.S.2d 411 (Sup.Ct.Kings Cty.1961), the defendant's check was actually in the mail at the time of default.

Moreover, in this matter, before plaintiff's declaration of default, defendants claimed that creating the reports would take hundreds of man-hours. This representation led credence to their assertion that they would not and could not cure. After all, given defendants' description of the labor necessary to create the reports, six business days was not nearly enough time. As a result, plaintiff was not required to wait for the entire cure period to lapse. Rather, accepting defendants' word that they could not and would not cure was justified, as was immediately accelerating under the circumstances. As both parties have written in their briefs, "the law does not require a vain and useless thing."

## III. CONCLUSION

For all these reasons, each of the defendants' claims fail as a matter of law, and summary judgment must be entered for plaintiff against BNE Mass.